## Clay Cloud v. State.

No. 2093.   Decided February 12, 1913.

**1.—Murder—Charge of Court—Self-defense—Seeking Explanation.**

While it is the settled law of this State that if one learns another is
circulating reports detrimental to him, he may seek an explanation and
thereby does not forfeit his right of self-defense, yet, where no threats are
made or communicated to defendant and there are no facts which would
create in any reasonable mind a present danger of death or serious bodily
injury, and from the State's point of view, the idea that deceased was making
any hostile demonstration at the time of the homicide was excluded, a failure
of the court to charge on self-defense is not error.

**2.—Same—Evidence—Declarations of Deceased.**

Where the declarations of the deceased occurred long before the homi-
cide, did not amount to a threat against the defendant and had no connection
with the difficulty which ended in the loss of deceased's life, there was no
error in excluding same.

**3.—Same—Charge of Court—Manslaughter—Circulating Slanderous Reports.**

Where, upon trial of murder, there was evidence that the deceased circu-
lated slanderous statements concerning the defendant of which the latter had
notice and thereupon called upon the deceased to retract said statements which
the latter refused to do, this in itself was not adequate cause and there was
no error in the court's failure to submit this as a cause for manslaughter.

**4.—Same—Adequate Cause—Slanderous Reports.**

A slanderous report in regard to anyone is not made statutory adequate
cause, and unless adequate cause existed and the same produced such anger,

etc., as to render the mind incapable of cool reflection, the homicide is not reduced to manslaughter.

### 5.—Same—Charge of Court—Manslaughter—Provocation.

Where, upon trial of murder, the evidence showed that defendant's mind was aroused to anger by slanderous reports made by deceased concerning defendant, this in itself was not adequate cause, and the court's charge on manslaughter requiring that the provocation must arise at the time of the commission of the offense, but that all the facts and circumstances in evidence must be considered, was no error.

### 6.—Same—Charge of Court—Adequate Cause—Insult to Female Relative.

Slanderous reports made by deceased concerning the defendant cannot reduce the homicide to manslaughter by the application of the law of insult to a female relative, as the latter is a statutory ground, while slanderous reports have never been declared to be adequate cause.

### 7.—Same—Charge of Court—Murder.

Where, upon trial of murder, the evidence raised the issue of murder in both degrees, there was no error in charging the jury as to the two degrees of murder.

### 8.—Same—Argument of Counsel—Reading Law.

In the absence of a bill of exceptions, complaints to remarks of counsel and reading law to the court cannot be reviewed.

### 9.—Same—Evidence—Contradicting Witness.

Where defendant's witness testified on the trial to a different state of. facts to which he testified on the examining trial, there was no error in admitting so much of the witness's statement as would show a contradiction.

### 10.—Same—Jury and Jury Law—Misconduct of Juror.

Where the testimony concerning the want of qualifications of a juror was filed after adjournment of court, the same cannot be considered on appeal; besides, the court did not err in overruling a motion for new trial on this ground.

### 11.—Same—Sufficiency of the Evidence—Punishment Not Excessive.

Where, upon trial of murder, the State's case showed that the deceased was about to prosecute defendant for sodomy and declined to retract the statements he had circulated with reference thereto, when defendant shot and killed him, a conviction of murder in the second degree, assessing a penalty of twenty-five years imprisonment in the penitentiary was well warranted.

Appeal from the District Court of Wise. Tried below before the Hon. J. W. Patterson.

Appeal from a conviction of murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*Jameson & Spencer* and *R. F. Spencer, Jr.,* for appellant.—On question of excluding declarations of deceased: Owen v. State, 52 Tex. Crim. Rep., 65; 105 S. W. Rep., 513; Burnam v. State, 61 Tex. Crim. Rep., 51; 133 S. W. Rep., 1045.

On question of court's failure to charge on self-defense: Thomson v. State, 49 Tex. Crim. Rep., 384; 93 S. W. Rep., 111, Williams v. State, 70 S. W. Rep., 756; Shannon v. State, 28 S. W. Rep., 687; Knight v. State, 66 Tex. Crim. Rep., 335; 147 S. W. Rep., 26.

On question of court's failure to charge that the circulation of slanderous reports and the refusal to retract is adequate cause: Young v. State, 54 Texas Crim. Rep., 417; Redman v. State, 52 id, 591; Branch's Digest, Sec. 442.

*C. E. Lane*, Assistant Attorney-General, for the State.

HARPER, JUDGE.—In this case it appears that deceased had been circulating some very slanderous reports in regard to appellant's conduct; in fact, charging him with sodomy. Appellant was informed of this fact, and he says he could not rest nor sleep, but the question here presented is one that has often been before the courts of the country—can we take the law into our own hands, or must we appeal to the duly constituted authorities if wrongfully accused? Upon being informed that deceased was circulating these reports, appellant arms himself and goes to the home of deceased. But we will let him tell it in his own language to see whether the issue of self-defense is raised or not. He testified:

"My name is Clay Cloud; I am the defendant in this case; and am 20 years old; was born in Tennessee, and have lived in Texas 18 years. My father is dead; cannot tell when he died; I have not seen him since I was two years old. My mother is now Mrs. Thacker. They have been married 12 or 13 years. I have lived in this county, the last time, about two or three years. I came to Wise County about five years ago; came by myself. My mother and her husband had not moved there then. I stayed here then about a month. I moved to Wise County the last time three years ago, lived here two years and then moved to Dallas County, lived in Dallas County one year, then moved back to Wise County. I was acquainted with Henry Craig; I got acquainted with him about a year before I went to work for him. I made a contract to work for him last year. I made that contract with him in March of last year. I was to do general farm work for him, and to work for him until crops were laid by. I worked for him, I think, three months.

"The first disagreement or trouble that occurred between Craig and myself: I came in from chopping cotton, put out some hay for the horses; he accused me with having intercourse with a mare. I denied it. He drew his knife on me, called me a God d—— son of a b——; told me if I denied it any more he would kill me. That occurred at the lot gate. When he drew his knife he got it from his right pocket. It was a three-bladed knife, something like three or three and one-half inches long. I told him I didn't want to have any trouble with him. I finally went on, put out some hay, and went to the house. Nothing else occurred there that night. The next morning I called for my time and he refused to pay me. He said he did not want to turn me loose; he didn't have money right then and he couldn't turn me loose; wouldn't do it. With reference to the trouble the night before, he said he was mistaken; that he was mad; been working with the binder

and was hot, mad, and not to pay any attention to that; to just go ahead and work. I did go on and work. The next conversation I had with him about quitting was in about two weeks, and was somewhere close to the house. I had been wanting to go to Oklahoma; told him in a month after I went there I wanted to go just as soon as he would let me loose, and he said he would. I told him that I wanted money; that I wanted to go to Oklahoma; he said no, he could not turn me loose that time; begged me to stay longer. He said, 'If you want to go for what I said a few days ago, you need not pay any attention to that. I told you I was mistaken.' I asked him in about eight or ten days then to let me loose. He says, 'Well, by God, if you want loose I will just pay you and let you go.' That was all that was said. He paid me and I went off.

"During the time I was working for Craig I kept company with Miss Ludie Splawn. I would sometimes go to see her every Sunday; sometimes would go every week or two. I would go with her to church, singing and prayer meeting. I thought a heap of the girl. I was in love with her. She was my sweetheart. I left Craig's place the 6th of June, and went to Oklahoma; stayed there about a month and came back to Fort Worth. At that time my mother and people lived in Dallas County. They were farming there. There was a fellow that came down from Oklahoma with me and we got supper and he had watch and I went back to their house after my watch and stayed there about twenty minutes and caught the 9 o'clock passenger train to Fort Worth.

"Dr. Simmons told me he heard there was some bad talk going on about me. I said 'Who is talking it?' He said he understood Henry Craig was telling around over the country that I had intercourse with a mare. I told him that was mighty bad talk. I told him it was not true.

"I went to Fort Worth and went to work there and worked about a month and then went to Dallas County. In Fort Worth I was employed by the street car company. I came back to Wise County in December of last year and lived at my stepfather's house, Mr. Thacker's. I stayed there until the killing. I had a little talk with Clyde Woods about this report Friday morning before the killing. The killing was on Friday morning. It was the morning before; the killing was the next day. In that conversation he told me that he heard that Henry Craig was making some bad talk about me. He wanted to know if it was true. I told him no, it was not. On the day before the killing I had a talk with my cousin, Allie Thacker, at the lot at our house. He told me that he heard there was some mighty bad talk going on in the country. I asked him what was it and he said Henry Craig, he understood, was talking around over the country I had intercourse with a mare. I told him it was not so. This was just about sundown. Hearing these reports made me feel bad, worried, because I did not want any such talk going on me. I did not eat supper that

night, and did not rest any that night, you might say. I did not rest because I was roused up. I ate mighty little breakfast. When I left the house I decided to go and talk to Craig. While I was working for Craig he told me that he had a fight with a fellow in Oklahoma and carried a gun for him. I saw other exhibitions of temper on his part. He would get mad, fall in fits of anger, and beat his stock unmercifully.

"On the morning of the killing I decided to go and have a talk with Craig about this matter. I carried a 38-Winchester rifle with me. We had other firearms at the house; had a shotgun and a pistol. I took the Winchester because he could see it and I thought it would keep him from jumping on me. My cousin, Allie Thacker, went with me. We got to the place of the killing somewhere between 7 and 8 o'clock. I called Henry out and told him I wanted to talk to him. He came down there, spoke to us before he got to us; came down where we were. I says, 'I understand that you are talking around over the country that I had intercourse with one of your mares.' He said, 'I did.' I asked him kindly to take it back, and he said he wouldn't take nothing back. I asked him the second time. He says, 'I will take nothing back.' I asked him again the third time. He said, 'No, by God,' wasn't going to take it back. He could prove it and was going to prove it. That roused my mind. Craig was standing at the east side of the trough, leaning over on it. I had my Winchester down by my side. It was so he could see it. He seemed to be angry, mad; raised up off the trough and dropped his right hand to his pocket, right front pocket, threw his left hand up to his breast and made a step towards me. When he made that step towards me I threw up my gun and shot him. When he put his hand to his pocket I thought he intended to kill me. I had seen an expression on his face indicating anger. I fired the gun because I thought he was going to kill me or hurt me, and I was going to protect myself. I shot him the first time, and he made another step towards me with his right hand down in one pocket and the other one up to his breast. From the time he got turned I had my gun on him, leveled on him, and it was too late to check the last shot."

The court refused to charge on the issue of self-defense, and if it is raised by any testimony, it is raised by this testimony of the defendant. The testimony offered in behalf of the State would exclude the idea that deceased at the time was doing any act which would justify defendant in slaying him, and would show that deceased had been summoned to appear before the grand jury; that appellant knew that deceased was making these statements in regard to him, and would authorize a conclusion to be drawn that the defendant killed deceased because of such statements, and because he feared a prosecution on the charge. It is the settled law of this State that if one learns another is circulating reports detrimental to him he may go and see the person in regard to such matters without forfeiting his

right to defend against an unlawful attack threatening his life or serious bodily injury, and even the fact that he takes a weapon with him does not abridge the right, if the circumstances are that he has reason to believe there is threatened danger to his life. But this appellant testifies as to no threat on the part of deceased to do him bodily harm, nor does he testify that anyone had communicated any threat. He does testify that a long time before the fatal difficulty on one occasion deceased had cursed him and drew a knife on him; but also testifies that deceased subsequently apologized to him and admitted he was in the wrong. If all this is true, what fact or circumstance does appellant testify to which would cause any man to reasonably believe that his life was in danger, or he was in danger of serious bodily injury. Appellant admits he armed himself, went to deceased's house, called him out, and demanded that he "take back" the statement that appellant was guilty of sodomy. Upon deceased declining to do so, he again made the request or demand that he do so, when deceased stated he would not and could prove that appellant was guilty. Appellant admits this made him angry, and he says deceased then "dropped his right hand to his right front pocket," raised up off the trough on which he was leaning, took one step, when he fired. This is all the danger or appearance of danger any witness puts in the case, and when we take into consideration that appellant sought the meeting, carried a weapon with him, was making demands or requests of deceased, the facts and circumstances in the case must be such that would create in any reasonable mind a present danger of serious bodily injury or death, before he would be authorized to take life. The acts and conduct of the deceased at the time, viewed in the light of the testimony of defendant alone, were not such as to create in any person's mind a reasonable apprehensioin of death. And when we take the testimony offered in behalf of the State, it is apparent that appellant was then in no serious danger, and the wounds in the body show that deceased was not, at the time the shots were fired, advancing towards appellant, the bullets having entered in the back about an inch and a half from the spinal column. It is true, the right to live and defend one's life is born and bred into every living thing, and is firmly engrafted into our law; yet human life is a sacred thing; when once taken it cannot be restored, and before this issue of self-defense is raised in a case, it must be reasonably apparent, under the circumstances, that there were at least some grounds for the person to believe that he was then and there in danger of losing his life. If, as it is amply shown by the record, deceased had circulated these reports, if they were untrue, as contended by appellant, it would have been far more consistent with good citizenship for him to have appealed for relief to the courts of his country than to have placed himself in a position where it has become incumbent to defend a more serious charge, that of having taken the life of his fellow-man. Had the evidence shown that deceased had threatened the life of appel-

lant, and these threats had been communicated to defendant, a different question would be presented, for then slight demonstrations will raise the issue. But under the evidence of defendant himself, no reason is shown why deceased should or would desire to take his life, and no reason for him to think that deceased did so desire. This disposes of the most serious contention in the case, but there are several other grounds in the motion, one being that the court erred in not permitting the witness Bob Avery to testify deceased had told him that "appellant had got to talking smart to Lucille around the house, and he had gone to see him about it," etc. As this had occurred long before the difficulty, while appellant was working for deceased, and no witness says this had anything to do with the difficulty when deceased lost his life, there was no error in the ruling of the court.

As we have held that the issue of self-defense was not raised by the testimony, there was no error in the court refusing the three special charges relating thereto.

The court also refused to give the fourth special charge requested, which reads as follows: "Gentlemen of the jury: If you find from the evidence that before the killing the deceased had made slanderous statements about the defendant, and the defendant was informed thereof and went to see the deceased to demand a retraction of such statements, and that when he did approach the deceased the deceased reaffirmed the charge or slanderous statements, and you find that by reason of the reaffirmance the defendant's mind was thereby rendered incapable of cool reflection and that in such state of mind he killed the deceased, the offense would only be manslaughter." The charge as requested is not the law. The fact that one's mind was rendered incapable of "cool reflection" would not alone be sufficient to reduce the offense to the grade of manslaughter. Our statute provides that two things must coincide, and that is, that adequate cause, as defined in law, must exist, and this must produce a degree of anger, rage, resentment or terror as to render the mind incapable of cool reflection.

A slanderous report in regard to a man is not made statutory adequate cause by our Code, and unless "adequate cause" existed, and this produced anger, rage, resentment or terror, even though the killing took place when the mind was incapable of cool reflection, the offense would not be reduced to manslaughter.

Murder in the first degree is where one forms the design to kill with a cool and sedate mind. Murder in the second degree can only arise where the killing is under such circumstances as necessarily implies that the design to kill was formed when the mind was not cool and deliberate and capable of cool reflection. That the mind may be in this condition will not in and of itself reduce an offense to the grade of manslaughter. The court in his charge did submit the issue of manslaughter, the only criticism of which is couched

in the following language: "Because the court erred in the first subdivision of his charge on manslaughter wherein the jury is told that, 'the provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation.' Said charge being a limitation of the rights of the defendant as to the determination by the jury of the condition of his mind at the time and before the killing it being clearly in evidence that on divers occasions prior to the killing the deceased had used slanderous language and statements about the defendant which was calculated to render the mind of the defendant incapable of cool reflection on a meeting with the deceased at any time as shown by bill of exception No. 7." The court, in addition to the subdivision criticised, also instructed the jury: "Although the law provides that the provocation causing the sudden passion must arise at the time of the killing, it is your duty in determining the adequacy of the provocation (if any), to consider in connection therewith, all the facts and circumstances in evidence in the case, and if you find that, by reason thereof, the defendant's mind at the time of the killing was incapable of cool reflection, and that said facts and circumstances were sufficient to produce such state of mind, in a person of ordinary temper, then the proof as to the sufficiency of the provocation satisfies the requirements of the law, and so in this case you will consider all the facts and circumstances in evidence in determining the condition of the defendant's mind at the time of the alleged killing, and the adequacy of the cause (if any) producing such condition."

As stated above, slanderous reports circulated about a man are not statutory "adequate cause," and the court was not in error in instructing the jury that the provocation must arise at the time of the commission of the offense, when he also instructed the jury in determining the "adequacy of the provocation" that they should consider all the facts and circumstances in evidence. Appellant is seeking to apply the law of "insult to a female relative" to slanderous reports about a man, but this we are not authorized by the Code to do. "Insult to a female relative" is declared by statute to be "adequate cause," while slanderous reports in regard to a man have never been declared so to be. The charge of the court on manslaughter is not subject to this criticism.

The evidence fully authorized the court to submit both murder in the first and second degree, and there was no error in the court so doing.

We cannot review those complaints in the motion complaining of the remarks of counsel for the State, nor the fact that they were permitted to read from law books and opinions, as these complaints are not verified in any way—no bill of exceptions having been reserved.

As appellant's cousin, Allie Thacker testified on this trial to a dif-

ferent state of facts to which he testified on the examining trial, there was no error on the part of the court in admitting so much of such statements as would show the contradictory statements.

The only other ground in the motion relates to whether or not T. A. Scott was a qualified juror. We have read the evidence, although it was not filed until after the adjournment of the term of court at which appellant was tried, consequently it is not presented in a way that would cause a reversal of the case. (Probest v. State, 60 Texas Crim. Rep., 608.) And having read the evidence, we cannot say that the court erred in holding that he was qualified. (Subdivision 13, Art. 692, Code Crim. Proc.)

We have carefully read this record and are of the opinion that the evidence amply supports the verdict of the jury, finding appellant guilty of murder in the second degree. The testimony would show, from the State's standpoint, that deceased caught appellant, while working with him, copulating with his mares; that he discharged him for such conduct, and told him if he would leave the country he would not report it. That appellant did leave and remained away for some months, but finally returning, deceased was summoned before the grand jury, and told a number of people that he caught appellant in this act. Appellant then arms himself, goes to the home of deceased, and demands that he take back the charges he made. Deceased declines to do so, when he is shot twice, both balls entering the back. Under such a state of facts, if the jury believed the State's evidence, the verdict is merciful, for it would have supported murder in the first degree.

The judgment is affirmed.

*Affirmed.*